**UNITED STATES OF AMERICA**
**MERIT SYSTEMS PROTECTION BOARD**

| | |
|---|---|
| SOCIAL SECURITY<br>    ADMINISTRATION,<br>    Petitioner,<br><br>v.<br><br>SETH GROSSMAN,<br>    Respondent. | DOCKET NUMBER<br>CB-7521-21-0009-T-1<br><br><br>DATE:  November 28, 2025 |

# THIS FINAL ORDER IS NONPRECEDENTIAL[1]

Seth Grossman, Brooklyn, New York, pro se.

Marc J. Boxerman, Esquire, Chicago, Illinois, for the petitioner.

Patrick W. Carlson, Esquire, Baltimore, Maryland, for the petitioner.

**BEFORE**

Henry J. Kerner, Vice Chairman
James J. Woodruff II, Member

**FINAL ORDER**

The respondent has filed a petition for review of the initial decision, which found good cause for his 45-day suspension under 5 U.S.C. § 7521. On review, he argues that the presiding administrative law judge (ALJ) erred in finding the

---

[1] A nonprecedential order is one that the Board has determined does not add significantly to the body of MSPB case law. Parties may cite nonprecedential orders, but such orders have no precedential value; the Board and administrative judges are not required to follow or distinguish them in any future decisions. In contrast, a precedential decision issued as an Opinion and Order has been identified by the Board as significantly contributing to the Board's case law. *See* 5 C.F.R. § 1201.117(c).

agency proved its charge of conduct unbecoming a Federal employee and reasserts that he should have dismissed the complaint on due process grounds. The respondent also challenges the determination that he did not prove his affirmative defenses of discrimination based on religion and reprisal for activity protected under Title VII. He disputes the presiding ALJ's determination that the agency established good cause for the respondent's 45-day suspension. Finally, he argues that the presiding ALJ should have granted his motion to compel the agency to produce a file on his brother and that the presiding ALJ was biased.

Generally, we grant petitions such as this one only in the following circumstances: the initial decision contains erroneous findings of material fact; the initial decision is based on an erroneous interpretation of statute or regulation or the erroneous application of the law to the facts of the case; the administrative judge's rulings during either the course of the appeal or the initial decision were not consistent with required procedures or involved an abuse of discretion, and the resulting error affected the outcome of the case; or new and material evidence or legal argument is available that, despite the petitioner's due diligence, was not available when the record closed. Title 5 of the Code of Federal Regulations, section 1201.115 (5 C.F.R. § 1201.115). After fully considering the filings in this appeal, we conclude that the petitioner has not established any basis under section 1201.115 for granting the petition for review. Therefore, we DENY the petition for review. Except as expressly MODIFIED to find that the respondent did not prove that his proposed suspension was caused by religious discrimination under a cat's paw theory, analyze the respondent's claims of reprisal for engaging in activity protected under Title VII using the appropriate framework, and address only whether the agency had good cause for the 20-day suspension it requested rather than the 45-day suspension authorized by the presiding ALJ, we AFFIRM the initial decision.

## BACKGROUND

The agency has employed the respondent as an ALJ since October 13, 2009. Initial Appeal File (IAF), Tab 79 at 6. His current duty station is the agency's New York Hearing Office located in New York City. IAF, Tab 78 at 30, Tab 79 at 6.

On March 23, 2017, the respondent met with his then first-level supervisor and his second-level supervisor. IAF, Tab 78 at 31-32, 45, Tab 79 at 30. During the meeting, the respondent's second-level supervisor issued him a reprimand for conducting unbecoming an ALJ based on the respondent's behavior during hearings. IAF, Tab 78 at 31. According to the respondent's second-level supervisor, during the meeting the respondent called his second-level supervisor a "Jew hater," threw the reprimand at him, and left the office, slamming the door behind him. *Id.* at 45; Hearing Transcript, vol. 2 (HT2) at 191-93, 211 (testimony of the respondent's second-level supervisor). The agency assigned a different agency official to investigate the respondent's behavior during the March 23, 2017 meeting. IAF, Tab 78 at 41, 44; HT2 at 191-93 (testimony of the respondent's second-level supervisor). The investigating official ultimately counseled the respondent regarding his alleged behavior but took no additional action. IAF, Tab 79 at 30.

Several years later, the respondent was involved in submitting an application for agency disability benefits on his brother's behalf and was listed as a third-party contact on the application. IAF, Tab 77 at 18-20; Hearing Transcript, vol. 1 (HT1) at 82 (testimony of the New York State Disability Determination Services analyst assigned to process the respondent's brother's application). The respondent and his sister shared legal guardianship of their brother. IAF, Tab 77 at 17, 40. Disability Determination Services (DDS) is a New York State entity that processes such applications for state residents on behalf of the agency. HT1 at 34-39 (testimony of the DDS analyst); IAF, Tab 1 at 7. DDS makes an initial decision on applications for agency disability

benefits, and, if the claimant disagrees with that decision, DDS issues a reconsideration decision. HT1 at 34 (testimony of the DDS analyst).

A DDS analyst determined that the respondent's brother's application lacked recent medical documentation substantiating his claim. HT1 at 40 (testimony of the DDS analyst). To remedy this problem, the analyst called the respondent on June 26, 2019, to schedule a consultative medical examination for the respondent's brother with a state contract doctor. IAF, Tab 77 at 6; HT1 at 36-37, 40-43, 82 (testimony of the DDS analyst). At one point during the conversation, the respondent told the DDS analyst that he would call her back. HT1 at 48 (testimony of the DDS analyst).

During his conversation with the analyst, the respondent asked to speak with her supervisor. HT1 at 48-49, 52-53 (testimony of the DDS analyst). In his conversations with the analyst and her supervisor, the respondent identified himself as an ALJ working for the agency, stated that his brother's condition was "bad" and met the requirements of a "listing," and asked to speak with the reviewing doctor assigned by DDS to his brother's claim.[2] HT1 at 47-53, 56, 64 (testimony of the DDS analyst); IAF, Tab 77 at 6, 9. By way of explanation, an individual who meets a "listing" is presumptively disabled due to the severity of his medical condition. HT1 at 63 (testimony of the DDS analyst), 262-63 (testimony of the Associate Chief Administrative Law Judge for Field Procedures and Employee Relations (ACALJ)). Both the analyst and her supervisor declined the respondent's request to speak with the physician. HT1 at 48 (testimony of the DDS analyst); IAF, Tab 77 at 7, 9.

---

[2] This reviewing doctor is different from the contract doctor assigned to conduct the examination. HT1 at 52-53 (testimony of the DDS analyst). Generally, the DDS reviewing doctor's determination as to whether an individual is disabled is conclusive for purposes of awarding agency disability benefits. HT1 at 55-56 (testimony of the DDS analyst); HT2 at 165-66 (testimony of the Associate Chief Administrative Law Judge for Field Procedures and Employee Relations).

On June 28, 2019, two days after the respondent spoke with DDS staff, he wrote an email to an agency ethics attorney. IAF, Tab 77 at 40-41; HT2 at 301-03 (testimony of the agency ethics attorney). In his email, he sought affirmation that he could "communicate with DDS" about his brother's application for agency disability benefits and ensure that the reviewing doctor had certain information, including a statement from the respondent. IAF, Tab 77 at 40.

On July 3, 2019, the agency ethics attorney responded via email. *Id.* at 38-39. The ethics attorney advised the respondent that he could not represent his brother without, among other limitations, obtaining agency permission. *Id.* at 38. The ethics attorney further explained that the respondent should initiate such a request through his first-level supervisor, who would "refer it to the appropriate official." *Id.* The ethics attorney described the act of representing someone in this context as "speak[ing] to DDS on your relative's behalf (other than by providing a factual statement about what you have personally witnessed of your relative's condition)." *Id.* The ethics attorney cautioned the respondent that, regardless of whether he was approved to represent his brother, the respondent could not offer his professional opinion, use his title or position, or use nonpublic information, duty time, or Government property, in connection with his brother's claim. *Id.* at 39. The respondent did not seek agency permission to represent his brother either before or after receiving this guidance. Hearing Transcript, vol. 3 (HT3) at 24-26 (testimony of the respondent).

On an unspecified date, the respondent obtained the direct telephone number of the DDS analyst assigned to his brother's claim by looking up her name in the agency's Microsoft Outlook directory. IAF, Tab 77 at 20, 29; HT1 at 30 (the respondent's opening statement), 230, 264-65 (testimony of the ACALJ). He inquired about the status of his brother's claim. IAF, Tab 77 at 20, 29. The DDS analyst referred him to an agency toll-free number. *Id.*

On the morning of November 12, 2019, the respondent telephoned the toll-free number from his agency office phone during duty time to inquire if his brother's application had been approved. HT1 at 227-28 (the respondent's stipulation on the record), 265-69 (testimony of the ACALJ). He remained on the call for approximately 50 minutes. HT1 at 227-28 (the respondent's stipulation on the record).

The agency later learned of the respondent's June 26, 2019 conversations with the DDS analyst and her supervisor. HT1 at 113-14, 117-20 (testimony of the agency's Regional Attorney Advisor for the New York Region); HT2 at 234 (testimony of the respondent's second-level supervisor). The respondent's first-level supervisor conducted an investigatory interview of the respondent on January 14, 2020, regarding his involvement with his brother's disability benefits application. IAF, Tab 77 at 17-33. In January 2021, the agency's ACALJ filed the underlying complaint in this matter, asking that the Board find good cause to suspend the respondent for 20 calendar days without pay for conduct unbecoming a Federal employee. IAF, Tab 1 at 4, 9-11.

The agency supported its charge with six specifications relating to the respondent's actions in connection with his brother's claim for agency benefits. *Id.* at 9-10. The first two specifications concerned the respondent's discussions with DDS staff on June 26, 2019. According to the agency, the respondent engaged in misconduct during those discussions by referencing his position with the agency and making statements regarding the merits of his brother's claim. *Id.* at 9. In the third specification, the agency alleged that the respondent used nonpublic agency information to try and gain access to the DDS reviewing doctor assigned to his brother's claim. *Id.* at 10. The agency alleged in the fourth specification that on or after June 26, 2019, the respondent obtained the nonpublic, direct telephone number for the DDS analyst from the agency's Outlook directory. *Id.* In the fifth specification, which the agency misnumbered specification 6, the agency alleged that on November 12, 2019, the respondent

called an agency toll-free number from his desk phone while on duty to inquire about the status of his brother's claim. *Id.* Finally, the sixth specification, which the agency misnumbered specification 7, stated that the "[r]espondent took actions for or otherwise represented his brother in connection with his brother's . . . claim before the [a]gency without obtaining" required agency permission. *Id.*

After holding a hearing, the presiding ALJ found that the agency proved its specifications except specification 3, regarding the respondent's alleged use of nonpublic information to try and contact the DDS reviewing physician. IAF, Tab 87, Initial Decision (ID) at 5, 14-22. The presiding ALJ concluded that the agency established that the proven specifications were unbecoming conduct that was good cause for the respondent's suspension. ID at 5, 46. He also determined that the respondent did not prove that, in proposing his suspension, the agency interfered with his judicial independence, discriminated against him based on his race or religion, or retaliated against him for his assertions that he was the subject of harassment and discrimination. ID at 26-29, 31-37. Nor was the ALJ convinced that the agency subjected the respondent to a hostile work environment in violation of Title VII. ID at 29-31. Finally, the presiding ALJ found good cause to suspend the respondent for 45 days, exceeding the agency's proposed 20-day suspension penalty. ID at 38-46.

The respondent has filed a petition for review. Petition for Review (PFR) File, Tab 1. The agency has responded to the petition, and the respondent has replied.[3] PFR File, Tabs 3-4.

---

[3] In its response to the petition for review, the agency urges the Board to "reject" the respondent's petition for review because he simply restates his arguments below and does not comply with Board requirements that his petition contain citations to the record. PFR File, Tab 3 at 6-7; *see* 5 C.F.R. § 1201.114(b) (requiring that a petition for review state a party's objections to the initial decision supported by factual and legal citations). While the agency's point is well taken, particularly as it concerns the lack of record citations, we exercise our authority to consider the respondent's arguments. *See* 5 C.F.R. § 1201.115(e) (reserving to the Board the authority to consider any issue in an

## DISCUSSION OF ARGUMENTS ON REVIEW

<u>The respondent did not prove his affirmative defenses.</u>

*The respondent did not prove that the complaint was the result of religious discrimination.*

The presiding ALJ found that the respondent did not prove that the agency discriminated against him because he is Jewish. ID at 26-29. The respondent sought to connect the January 2021 complaint currently before us to an incident in March 2017, in which his second-level supervisor reprimanded the respondent for conduct unbecoming. IAF, Tab 68 at 3. The presiding ALJ found that the March 2017 incident did not result in the instant complaint. ID at 28-29. On review, the respondent argues that the instant complaint is "just another manifestation of the harassment" evidenced by the false accusation that he called his second-level supervisor a "Jew-hater." PFR File, Tab 1 at 21-22. The respondent may be seeking to prove that his second-level supervisor manipulated the ACALJ into filing the instant complaint. Therefore, we modify the initial decision to consider whether the respondent proved that his second-level supervisor was the proximate cause of the proposed suspension under a cat's paw theory, which the presiding ALJ did not address.

Under a cat's paw theory, an agency may be liable for the discriminatory animus of a supervisor who did not make the "ultimate employment decision" at issue. *Feder v. Department of Justice*, EEOC Appeal No. 0720110014, 2012 WL 3059995, at *16 (July 19, 2012). Under this theory, an employer is liable if a supervisor performs an act motivated by discrimination with the intention to cause an adverse employment action and that act is the proximate cause of the ultimate employment action. *See Wilson v. Department of the Navy*, 122 M.S.P.R. 585, ¶ 6 (2015) (so stating in the context of a claim of discrimination in violation of the Unformed Services Employment and

---

appeal before it).

Reemployment Rights Act of 1994 (USERRA)) (citing *Staub v. Proctor Hospital*, 562 U.S. 411, 422 (2011) (holding that "if a supervisor performs an act motivated by antimilitary animus that is *intended* by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action, then the employer is liable under USERRA") (emphasis in original)), *aff'd*, 843 F.3d 931 (Fed. Cir. 2016); *Martin S. v. Department of the Navy*, EEOC Petition No. 2024004063, 2024 WL 4011182, at *5 (Aug. 19, 2024) ("Under a cat's paw theory, animus and responsibility for adverse action can be attributed to a supervisor who was not the ultimate decision maker, if that supervisor intended the adverse action to be a consequence of her discriminatory conduct.") (citing *Feder*, 2012 WL 3059995, at *16).  If a supervisor initiates an investigation for discriminatory reasons, and the investigation ultimately leads another agency official to issue an action, the supervisor's animus will be imputed to the issuing official.  *See Young v. Department of Homeland Security*, 2024 MSPB 18, ¶¶ 8, 12-15, 19 (reaffirming that in an individual right of action appeal that the Board will consider the retaliatory motive of the individual who reported the employee's misconduct that resulted in the challenged disciplinary action).

According to the respondent, in March 2017, his second-level supervisor falsely accused the respondent of calling the supervisor a "Jew hater."  IAF, Tab 68 at 3, 78 at 31-32, Tab 79 at 6-9, Tab 86 at 25.  The agency assigned a different official to investigate the respondent's conduct.  HT2 at 120-21 (testimony of the respondent's second-level supervisor); IAF, Tab 78 at 40-41, 44.  That official counseled the respondent about the incident in May 2017.  IAF, Tab 79 at 30.  The ACALJ did not testify during the proceedings below about the March 2017 incident, and the respondent does not point to evidence that suggests the ACALJ considered the incident or the resulting counseling in his decision to issue the complaint.

The presiding ALJ found that the ACALJ, who filed the instant complaint, did not consider the respondent's religion. ID at 9. The parties do not dispute this finding, and we discern no basis to disturb it. HT1 at 301 (testimony of the ACALJ). The presiding ALJ also determined that the ACALJ made the "decision to file the [c]omplaint . . . entirely [on] his own." ID at 9. Both the ACALJ and the respondent's second-level supervisor testified that the second-level supervisor had no role in the decision to file the complaint. HT1 at 250-51, 300 (testimony of the ACALJ); HT2 at 232-35 (testimony of the respondent's second-level supervisor). Further, the respondent's second-level supervisor did not report to the ACALJ. HT1 at 233-34, 246-47 (testimony of the ACALJ).

The respondent's second-level supervisor's sole involvement in the chain of events leading to the complaint before us was that he received, and then forwarded on, DDS's allegations about the respondent's interactions with DDS on his brother's claim on June 26, 2019. HT1 at 117-20 (testimony of the Regional Attorney Advisor); HT2 at 234-35 (testimony of the respondent's second-level supervisor). His testimony reflects that his role in the matter was merely ministerial, and the respondent did not elicit any testimony to suggest that the second-level supervisor's referral was discretionary. HT2 at 234-35 (testimony of the respondent's second-level supervisor). Without evidence that the respondent's second-level supervisor did more than fulfill his nondiscretionary job functions, we cannot impute his alleged discriminatory animus to the ACALJ who filed the complaint.

The lapse of time supports our conclusion. Suspicious timing may be circumstantial evidence of discrimination. *Pridgen v. Office of Management and Budget*, 2022 MSPB 31, ¶ 24. However, the incidents must be "very close" in time. *Clark County School District v. Breeden*, 532 U.S. 268, 273-74 (2001) (citations omitted). For example, a separation of 20 months between two events "suggests, by itself, no causality at all." *Id.* at 274. Here, the March 2017 incident between the respondent and his second-level supervisor, and the

resulting May 2017 counseling, were remote in time to the filing of the instant complaint in January 2021. IAF, Tab 1 at 11, Tab 78 at 31-32, Tab 79 at 30. The passage of almost 4 years leads us to conclude that it is unlikely that the events are connected. In sum, we agree with the presiding ALJ that the respondent has not met his burden to prove religious discrimination. We modify the initial decision to incorporate our discussion, above, as to why the respondent did not prove his discrimination claim under a cat's paw theory.

In finding that the respondent failed to prove his claim of religious discrimination, the presiding ALJ alternatively reasoned that, even if the respondent had used the term "Jew hater," it would not evidence discriminatory motive on the part of his second-level supervisor.[4] ID at 28-29. The presiding ALJ did not make a finding as to whether the respondent actually made the "Jew hater" statement. ID at 10, 28-29. The respondent reiterates on review that his second-level supervisor "lied" about the March 2017 incident. PFR File, Tab 1 at 21-22. Because the respondent did not prove causation, we agree with the presiding ALJ that it was not necessary to determine whether the respondent called his second-level supervisor a "Jew hater."

<u>We modify the presiding ALJ's reasoning as to why the respondent did not prove reprisal.</u>

The presiding ALJ also found that the respondent did not prove his claim of retaliation for complaining of "harassment and discrimination." ID at 31-37 (quoting IAF, Tab 23 at 7). The parties do not dispute the presiding ALJ's conclusion. We affirm the presiding ALJ's conclusion that the respondent did not prove his retaliation claim. We revisit the presiding ALJ's finding to correct his reasoning.

---

[4] Because we have resolved the respondent's claim on other grounds, we need not reach the question of whether a supervisor's false allegation that a subordinate accused him of discrimination could evidence retaliatory animus on the part of the supervisor.

In a chapter 75 appeal, the Board adjudicates an affirmative defense of retaliation for a protected disclosure or activity identified in 5 U.S.C. § 2302(b)(8) and (b)(9)(A)(i), (B), (C), or (D) under the burden shifting standards applicable to individual right of action (IRA) appeals.  5 U.S.C. § 1221(e), (i); *Alarid v. Department of the Army*, 122 M.S.P.R. 600, ¶ 12 (2015).[5]  Under these standards, which the presiding ALJ employed here, an employee has the initial burden to prove that he made such a disclosure or engaged in such activity, and it was a contributing factor in the action at issue.  ID at 31-37; *see Pridgen*, 2022 MSPB 31, ¶ 49; *Alarid*, 122 M.S.P.R. 600, ¶¶ 12-14.  The presiding ALJ found that the respondent made a protected disclosure or engaged in protected activity but did not establish that his disclosures or activity was a contributing factor in his proposed suspension.  ID at 32-37.  We modify this reasoning.

The respondent's allegations do not fall under IRA standards.  Disclosing discrimination or taking an initial step toward legal action against an employer for discrimination against oneself generally does not fall within the scope of the Board's IRA jurisdiction.  *See* 5 U.S.C. § 2302(b)(9)(B) (protecting the "refus[al] to obey an order that would require the individual to violate a law, rule, or regulation"); *Abutalib v. Merit Systems Protection Board*, 127 F.4th 373 (Fed. Cir. 2025) (finding that a claim of retaliation for a Title VII EEO complaint that does not seek to remedy whistleblower reprisal is not within the scope of the Board's IRA jurisdiction); *McCray v. Department of the Army*, 2023 MSPB 10, ¶¶ 12,

---

[5] A chapter 75 appeal arises under the Board's appellate jurisdiction.  *Jonson v. Federal Deposit Insurance Corporation*, 122 M.S.P.R. 454, ¶ 9 (2015).  In contrast, the Board has original jurisdiction over this case under 5 U.S.C. § 7521.  *Levinson*, 2023 MSPB 20, ¶ 41.  Because we conclude here that the respondent's alleged disclosure or activity falls under Title VII, we need not reach the issue of whether the Board would adjudicate an ALJ's claim of whistleblower reprisal under the burden shifting standards applicable to IRA appeals in the context of an action arising under 5 U.S.C. § 7521.  *See* 5 U.S.C. § 1221(i) (providing that the procedures for IRA appeals apply in adverse action appeals brought under chapter 75 "if, or to the extent that, a prohibited personnel practice as defined in section 2302(b)(8) or section 2302(b)(9)(A)(i), (B), (C), or (D) [of Title 5] is alleged"); *Alarid*, 122 M.S.P.R. 600, ¶ 12 (interpreting the relevant statutory provisions, including 5 U.S.C. § 1221(i)).

19-30 (holding that disclosing discrimination under the Rehabilitation Act of 1973 is not protected under 5 U.S.C. § 2302(b)(8) and that filing an appeal, complaint, or grievance alleging reprisal for discrimination against oneself in which one does not seek to remedy reprisal for whistleblowing is not protected activity under 5 U.S.C. § 2302(b)(9)(A)(i), (B), (C)); *Edwards v. Department of Labor*, 2022 MSPB 9, ¶¶ 10-28 (holding that disclosing violations of Title VII is not protected under 5 U.S.C. § 2302(b)(8), and that complaining to an agency's equal employment opportunity (EEO) office of discrimination on behalf of other employees who had not filed EEO complaints, and without seeking remedy whistleblower reprisal, fell outside the scope of 5 U.S.C. § 2302(b)(9)(A)(i) and (B)), *aff'd*, No. 2022-1967, 2023 WL 4398002 (Fed. Cir. July 7, 2023).

The respondent alleged below that the agency proposed his suspension in retaliation for his formal and informal complaints of "harassment and discrimination." IAF, Tab 65 at 9. He did not testify in support of his reprisal claim or clarify its nature in his opening statement or post-hearing briefs. HT1 at 26-32 (the respondent's opening statement); HT2 at 187-88 (testimony of the respondent); HT3 at 19-34 (testimony of the respondent); IAF, Tabs 84, 86. Based on his reference to "harassment and discrimination" and allegation of discrimination based on his "Jewish faith and Caucasian descent" in his amended answer to the complaint and elsewhere in his submissions, it is likely that the respondent was asserting a claim of retaliation for prior EEO complaints or disclosures of alleged religious or racial discrimination in violation of Title VII. IAF, Tab 65 at 8-9, Tab 78 at 38, Tab 79 at 13-15, Tab 84 at 26. Therefore, to the extent that the presiding ALJ concluded that the respondent failed to prove retaliation using the framework applicable to IRA appeals, we modify his finding.

The respondent had the burden of proving that his protected activity was a motivating factor or "but-for" cause of the ACALJ's decision to file the complaint. *Pridgen*, 2022 MSPB 31, ¶¶ 20-22, 30. Because the respondent did not further explain the basis of his retaliation claim in his pleadings or testimony,

and does not argue the matter on review, we modify the presiding ALJ's conclusion to find that the respondent did not prove that retaliation was a motivating factor or but-for cause of the agency's proposed suspension.

Good cause exists for the respondent's 20-calendar-day suspension.

*We modify the initial decision to consider a 20-day suspension.*

The respondent contests the presiding ALJ's determination that "good cause exists to suspend [the] [r]espondent . . . for forty-five (45) calendar days." ID at 46. The respondent argues that the Board may not impose a penalty greater than the 20-day suspension requested by the agency. PFR File, Tab 1 at 3-5. We agree.

When the Board makes a good cause determination, it authorizes but does not require the agency to act. *Social Security Administration v. Levinson*, 2023 MSPB 20, ¶ 37, *aff'd per curiam*, No. 2023-2277, 2024 WL 3579909 (Fed. Cir. July 30, 2024). The employing agency retains discretion to take the Board-approved action, impose a lesser sanction, or take no action at all. *Department of Health and Human Services v. Jarboe*, 2023 MSPB 22, ¶ 9. Here, the agency sought approval for a 20-calendar-day unpaid suspension. IAF, Tab 1 at 4, 11. It did not seek permission to amend its complaint to include a greater penalty or argue below that the Board should increase the proposed penalty. Therefore, the issue of whether the agency has good cause to suspend the respondent for 45 days is not before us. *See, e.g.*, *Rodriguez v. Department of Homeland Security*, 117 M.S.P.R. 188, ¶¶ 12-13 (2011) (explaining that the Board will not redraft an agency's charge and then sustain an agency action based on the redrafted charge). Further, expressing an opinion as to whether good cause exists for a 45-day suspension would be an advisory opinion that we are prohibited from issuing. 5 U.S.C. § 1204(h). We modify the initial decision to consider whether the agency has shown good cause to issue a penalty up to a 20-day suspension.

The presiding ALJ properly applied the Douglas factors.

In original jurisdiction cases such as this one, under 5 U.S.C. § 7521, the Board looks to the factors articulated in *Douglas v. Veterans Administration*, 5 M.S.P.R. 280, 305-06 (1981), to guide its penalty analysis. *Levinson*, 2023 MSPB 20, ¶ 41. In *Douglas*, 5 M.S.P.R. at 305-06, the Board articulated a nonexhaustive list of factors relevant to penalty determinations. In finding good cause for the respondent's suspension, the presiding ALJ considered the *Douglas* factors. ID at 38-46. The respondent disagrees with the presiding ALJ's assessment of a number of the *Douglas* factors. We find that the presiding ALJ's analysis was proper.

The presiding ALJ found the following factors aggravating for purposes of determining the appropriate penalty: the respondent's misconduct was intentional and serious; he held a prominent position as an ALJ in which he adjudicated claims for disability benefits like those of his brother; his behavior negatively impacted the agency's trust and confidence in his ability to perform his assigned duties, as articulated by the ACALJ; there was knowledge of the respondent's misconduct within the agency and DDS; he was on clear notice of the applicable ethical standards pertaining to his misconduct; he had a "poor potential for rehabilitation"; and alternative sanctions were unlikely to deter him from future misconduct. ID at 39-45. The presiding ALJ noted that the agency's proposed penalty was lower than the penalties it had recommended in arguably comparable instances of ALJ misconduct. ID at 41. The presiding ALJ considered as mitigating factors the respondent's lack of prior discipline, his length of service (which was over 11 years at the time the agency filed the complaint), his past work record, and the strain of dealing with his brother's illness. ID at 40-41, 45; IAF, Tab 1 at 6, Tab 79 at 6; HT1 at 299 (testimony of the ACALJ).

The respondent challenges the presiding ALJ's assessment of some of these factors. Specifically, he disagrees that his conduct was intentional and that his actions impacted the agency's trust in him. PFR File, Tab 1 at 11, 19-20. He

disputes that sufficient people within the agency were aware of his misconduct to cause it to be "notorious." *Id.* at 20. He also argues that he does not lack the potential for rehabilitation. *Id.* at 15-16, 19-20.

As to whether the respondent's conduct was intentional, the presiding ALJ concluded that the respondent "intentionally identified himself" as an ALJ "when advocating on his brother's behalf before DDS." ID at 40. The respondent argues that because DDS initiated the telephone call regarding his brother's claim, he had no chance to plan what he was going to say in advance. PFR File, Tab 1 at 11; HT3 at 31 (testimony of the respondent). We discern no error in the presiding ALJ's reasoning.

Even when, as here, a specific intent is irrelevant to whether a charge has been proved, whether the offense was intentional or technical or inadvertent is always a factor to be considered in assessing the reasonableness of an agency's penalty. *Cross*, 89 M.S.P.R. 62, ¶ 10. The respondent testified that he told the DDS analyst that he knew she was "not allowed to dismiss [his brother's] case." HT3 at 21 (testimony of the respondent). He also acknowledged during his investigative interview that he identified himself as an ALJ so that the DDS analyst would schedule his brother's consultative medical exam at home. IAF, Tab 77 at 23. The respondent requested to speak with "the reviewing psychiatrist," who he believed would ultimately decide whether his brother qualified as disabled for purposes of agency benefits. HT3 at 21, 24, 27-28, 31 (testimony of the respondent).

Although the respondent argues that he was surprised by the unexpected call from DDS, any surprise was vitiated when the respondent requested to, and did, call the DDS analyst back. HT1 at 48-49 (testimony of the DDS analyst). After doing so, he spoke with her supervisor, reiterating that he was an ALJ, stating his brother's condition qualified under a listing, and again asking to speak with the reviewing physician. HT1 at 48 (testimony of the DDS analyst); IAF, Tab 77 at 9. This conduct supports the presiding ALJ's conclusion that the

respondent made his statements with the intent to influence the favorable adjudication of his brother's benefits claim.

The presiding ALJ credited the ACALJ's testimony that the respondent's actions "diminish[ed]" his trust in the respondent. ID at 41 (citing HT1 at 294-95 (testimony of the ACALJ)). The respondent questions this diminished trust on the basis that he has continued to perform his job duties. PFR Tile, Tab 1 at 19-20.

The respondent's argument is unpersuasive. Generally, an agency's decision to continue an employee in his position evidences continued trust in him notwithstanding an agency's belated contention that his offense required removal. *Goode v. Defense Logistics Agency*, 31 M.S.P.R. 446, 450-51 (1986); *Stead v. Department of the Army*, 27 M.S.P.R. 630, 634-35 (1985). However, unlike cases in which the Board has applied this reasoning, the agency did not seek to remove the respondent in its complaint. Nor did the ACALJ testify that he completely lost trust in the respondent, which might make the agency's proposed 20-day suspension appear insufficient. IAF, Tab 1 at 4, 11. Rather, the ACALJ testified that the respondent's behavior "diminish[ed]" his trust. HT1 at 294-95 (testimony of the ACALJ). We see no contradiction in the agency's reduced trust and its proposal of a 20-day suspension.

The notoriety of the offense is another *Douglas* factor that the presiding ALJ determined was aggravating for purposes of determining the appropriate penalty. ID at 42; *see Douglas*, 5 M.S.P.R. at 305 (listing "the notoriety of the offense or its impact upon the reputation of the agency" among the factors that may be relevant to a penalty determination). The presiding ALJ concluded that although there was not "[g]reat public notoriety," the knowledge of the respondent's conduct within the agency and among certain employees at DDS was an aggravating penalty factor. ID at 42. The respondent disputes that his conduct is "notorious" because the number of individuals who are aware of it "can be counted on the fingers of one hand." PFR File, Tab 1 at 20.

There is no specific number of individuals that must be aware of an individual's misconduct to render this factor aggravating. *See Long v. Social Security Administration*, 635 F.3d 526, 537 (Fed. Cir. 2011) (finding that knowledge of an ALJ's behavior among his neighbors, coworkers, and other ALJs, as well as the local police's posting of his mug shot, constituted "sufficient notoriety or public awareness to warrant 'good cause' for disciplinary action"). The Board has concluded an employee's conduct was notorious when it was known by supervisors and coworkers at the employee's duty station. *Taylor v. Department of the Navy*, 35 M.S.P.R. 438, 444 (1987), *aff'd per curiam*, 861 F.2d 728 (Fed. Cir. 1988) (Table). Here, the DDS analyst and supervisor were aware of the respondent's conduct. IAF, Tab 77 at 6, 9. Further, because the DDS analyst viewed the respondent's actions as "inappropriate," she consulted with a third DDS employee who worked on "possible fraud cases." HT1 at 77-81 (testimony of the DDS analyst). We find the ALJ appropriately described the respondent's offense as notorious in light of the knowledge of, and unfavorable view, of his behavior among employees of a state agency that works closely with the agency to decide claims for disability benefits.

In finding that the respondent lacked rehabilitative potential, the presiding ALJ observed that the respondent "did not show remorse" and "did not admit that he did anything wrong." ID at 43 (quoting HT1 at 300 (testimony of the ACALJ)). One of the *Douglas* factors is the potential for the employee's rehabilitation. *Levinson*, 2023 MSPB 20, ¶ 44. The Board considers expressions of remorse as reflecting rehabilitative potential and thus militating in favor of a lesser penalty. *Id.* Conversely, an individual's rationalizations and lack of remorse may reflect little rehabilitative potential and thus be aggravating factors. *Id.*

The respondent disagreed below that he did anything wrong during his phone calls with DDS employees. IAF, Tab 84 at 14-15. We discern no error in the presiding ALJ's determination that the respondent lacked remorse. In fact, on

review, the respondent again "refuses to show remorse for a crime he did not commit and never had any intention of committing." PFR File, Tab 1 at 15.

In finding that the respondent lacked remorse, the presiding ALJ relied, in part, on the respondent "ma[king] light of the charges against him" both during the agency's investigative interview and submissions during the adjudication of his appeal and "doubl[ing]-down on this lack of accountability" during the hearing. ID at 43-44. The respondent argues on review that the presiding ALJ erred by considering the respondent's behavior during the proceedings below in his determination regarding rehabilitative potential. *Id.* at 20.

The Board has held that a fact finder cannot rely on his observations regarding an employee's attitude and behavior at the hearing as circumstantial evidence that he engaged in the misconduct charged. *Cheng v. Department of Agriculture*, 84 M.S.P.R. 144, ¶ 4 (1999). Doing so is contrary to the general rule that character evidence may not be introduced circumstantially to prove the conduct of the witness. *Ibrahim v. Department of the Army*, 30 M.S.P.R. 531, 536 (1986) (citing Fed. R. Evid. 404(a)(1) (stating the general rule that, "Evidence of a person's character or character trait is not admissible to prove that on a particular occasion the person acted in accordance with the character or trait")). However, an employee's failure to express remorse at any time during the Board's proceedings supports a finding that he is a poor prospect for rehabilitation. *Shaw v. Department of the Air Force*, 80 M.S.P.R. 98, 117 (1998); *see Levinson*, 2023 MSPB 20, ¶ 44 (considering a respondent's failure to express remorse during the course of the adjudication as suggesting very little potential for rehabilitation).

We need not consider the respondent's behavior during the proceedings below to determine that he lacked remorse; he himself has stated that he is not remorseful. Therefore, we do not reach the propriety of the ALJ considering the respondent's adjudicatory conduct. The respondent's lack of remorse is patent in this case. PFR File, Tab 1 at 15.

The parties do not dispute the presiding ALJ's assessment of the remaining *Douglas* factors, and we perceive no error in his analysis. Therefore, we do not revisit those factors here.

## The presiding ALJ did not abuse his discretion by declining to order the agency to produce the respondent's brother's entire DDS file.

The respondent argues that the presiding ALJ erred in denying the respondent's motion to compel the agency to produce a copy of his brother's DDS file. PFR File, Tab 1 at 16-17. Although the presiding ALJ granted the respondent's motion to compel, in part, he declined to order the agency to produce "the whole of" the DDS file. IAF, Tab 32 at 1-2, 8-9, 30, Tab 55 at 8. In so ruling, the presiding ALJ did not abuse his discretion.

Discovery is the process by which a party may obtain relevant information from another person or a party that the other person or party has not otherwise provided. *Chandler v. Department of the Treasury*, 120 M.S.P.R. 163, ¶ 10 (2013); 5 C.F.R. § 1201.72(a). Relevant information includes information that appears reasonably calculated to lead to the discovery of admissible evidence. *Chandler*, 120 M.S.P.R. 163, ¶ 10; 5 C.F.R. § 1201.72(a). What constitutes relevant information in discovery is to be liberally interpreted, and uncertainty should be resolved in favor of the movant absent any undue delay or hardship caused by such request. *Id.* Discoverable information is not without boundaries however, and the requesting party must ultimately show that the information sought is relevant or is likely to lead to relevant evidence. *Id.* A presiding ALJ has broad discretion in ruling on discovery matters, and the Board will not find reversible error in such rulings absent an abuse of discretion. *Dieter v. Department of Veterans Affairs*, 2022 MSPB 32, ¶ 25; *see* 5 C.F.R. §§ 1201.41(b)(4) (reflecting that an administrative judge has the authority to rule on discovery motions in matters falling under the Board's appellate jurisdiction), 1201.11, 1201.121(b)(1).

The respondent requested in discovery that the agency provide a copy of his brother's entire DDS file. IAF, Tab 32 at 8-9, 30. The agency generally objected and provided what it identified as "relevant non-privileged documents . . . for the period January 28, 2019 through October 30, 2019." *Id.* at 30. Such documents consisted of copies of the statements of the DDS analyst and her supervisor regarding their discussions with the respondent on June 26, 2019, as well as a redacted document reflecting when DDS uploaded those statements into its electronic system. IAF, Tab 36 at 24-31, 127, 138-44. In moving to compel the remainder of the DDS file, the respondent argued that "there may be some documents in the file that are not helpful and some that are crucial." IAF, Tab 32 at 8.

The presiding ALJ declined to order the agency to produce the file, concluding that the request was not reasonably calculated to lead to the discovery of admissible evidence. IAF, Tab 55 at 8. On review, the respondent takes issue with the agency's argument in its opposition to his motion to compel that the file was protected under the Privacy Act of 1974. PFR File, Tab 1 at 16-17; IAF, Tab 36 at 24-31. We do not reach that argument here because the presiding ALJ did not deny the respondent's motion on that basis, but rather on relevancy grounds. IAF, Tab 55 at 8.

The respondent also argues that he could not articulate what he needed from the file without knowing its contents. PFR File, Tab 1 at 17. Given that the file in question concerned the respondent's brother, rather than the respondent, we agree with the presiding ALJ's ruling. The DDS file was unlikely to contain anything pertinent to the respondent's proposed suspension except for information concerning the incidents set forth in the agency's complaint. The only activity concerning interactions with DDS alleged in the agency's specifications is the respondent's conversations with DDS staff on June 26, 2019. IAF, Tab 1 at 9-10. The agency provided the respondent with the documents

from his brother's DDS file relating to that incident. IAF, Tab 36 at 24-25, 138-142.

The respondent has not explained how evidence regarding the remaining specifications, i.e., his misuse of the agency's Outlook directory to look up the telephone number for the DDS analyst, his use of Government time and property to call an agency toll-free number, and his failure to obtain advance agency consent to take action for or represent his brother on his claim for agency benefits, would likely have made its way into his brother's DDS file. IAF, Tab 1 at 10. Therefore, we discern no abuse of discretion in the presiding ALJ's ruling.

<u>The respondent has not shown that the presiding ALJ was biased.</u>

The respondent offers his disagreement with the presiding ALJ's rulings as evidence of bias. PFR File, Tab 1 at 4, 13. There is a presumption of honesty and integrity on the part of administrative judges that can only be overcome by a substantial showing of personal bias, and the Board will not infer bias based on an administrative judge's case-related rulings. *Vaughn v. Department of the Treasury*, 119 M.S.P.R. 605, ¶ 18 (2013). An administrative judge's conduct during the course of a Board proceeding warrants a new adjudication only if his comments or actions evidence a deep-seated favoritism or antagonism that would make fair judgment impossible. *Id.* None of the presiding ALJ's case-related rulings and observations that the respondent references on review evidence a deep-seated antagonism towards the respondent. Therefore, they are insufficient to justify a bias determination.

Accordingly, we affirm the initial decision as modified above.

## NOTICE OF APPEAL RIGHTS[6]

The initial decision, as supplemented by this Final Order, constitutes the Board's final decision in this matter. 5 C.F.R. § 1201.113. You may obtain

---

[6] Since the issuance of the initial decision in this matter, the Board may have updated the notice of review rights included in final decisions. As indicated in the notice, the Board cannot advise which option is most appropriate in any matter.

review of this final decision. 5 U.S.C. § 7703(a)(1). By statute, the nature of your claims determines the time limit for seeking such review and the appropriate forum with which to file. 5 U.S.C. § 7703(b). Although we offer the following summary of available appeal rights, the Merit Systems Protection Board does not provide legal advice on which option is most appropriate for your situation and the rights described below do not represent a statement of how courts will rule regarding which cases fall within their jurisdiction. If you wish to seek review of this final decision, you should immediately review the law applicable to your claims and carefully follow all filing time limits and requirements. Failure to file within the applicable time limit may result in the dismissal of your case by your chosen forum.

Please read carefully each of the three main possible choices of review below to decide which one applies to your particular case. If you have questions about whether a particular forum is the appropriate one to review your case, you should contact that forum for more information.

**(1) <u>Judicial review in general</u>**. As a general rule, an respondent seeking judicial review of a final Board order must file a petition for review with the U.S. Court of Appeals for the Federal Circuit, which must be <u>received</u> by the court within **60 calendar days** of <u>the date of issuance</u> of this decision. 5 U.S.C. § 7703(b)(1)(A).

If you submit a petition for review to the U.S. Court of Appeals for the Federal Circuit, you must submit your petition to the court at the following address:

U.S. Court of Appeals
for the Federal Circuit
717 Madison Place, N.W.
Washington, D.C. 20439

Additional information about the U.S. Court of Appeals for the Federal Circuit is available at the court's website, www.cafc.uscourts.gov. Of particular

relevance is the court's "Guide for Pro Se Petitioners and Respondents," which is contained within the court's Rules of Practice, and Forms 5, 6, 10, and 11.

If you are interested in securing pro bono representation for an appeal to the U.S. Court of Appeals for the Federal Circuit, you may visit our website at http://www.mspb.gov/probono for information regarding pro bono representation for Merit Systems Protection Board respondents before the Federal Circuit. The Board neither endorses the services provided by any attorney nor warrants that any attorney will accept representation in a given case.

**(2) Judicial or EEOC review of cases involving a claim of discrimination**. This option applies to you only if you have claimed that you were affected by an action that is appealable to the Board and that such action was based, in whole or in part, on unlawful discrimination. If so, you may obtain judicial review of this decision—including a disposition of your discrimination claims—by filing a civil action with an appropriate U.S. district court (*not* the U.S. Court of Appeals for the Federal Circuit), within **30 calendar days** after you receive this decision. 5 U.S.C. § 7703(b)(2); *see Perry v. Merit Systems Protection Board*, 582 U.S. 420 (2017). If you have a representative in this case, and your representative receives this decision before you do, then you must file with the district court no later than **30 calendar days** after your representative receives this decision. If the action involves a claim of discrimination based on race, color, religion, sex, national origin, or a disabling condition, you may be entitled to representation by a court-appointed lawyer and to waiver of any requirement of prepayment of fees, costs, or other security. *See* 42 U.S.C. § 2000e-5(f) and 29 U.S.C. § 794a.

Contact information for U.S. district courts can be found at their respective websites, which can be accessed through the link below:

http://www.uscourts.gov/Court_Locator/CourtWebsites.aspx.

Alternatively, you may request review by the Equal Employment Opportunity Commission (EEOC) of your discrimination claims only, excluding all other issues. 5 U.S.C. § 7702(b)(1). You must file any such request with the EEOC's Office of Federal Operations within **30 calendar days** after you receive this decision. 5 U.S.C. § 7702(b)(1). If you have a representative in this case, and your representative receives this decision before you do, then you must file with the EEOC no later than **30 calendar days** after your representative receives this decision.

If you submit a request for review to the EEOC by regular U.S. mail, the address of the EEOC is:

Office of Federal Operations
Equal Employment Opportunity Commission
P.O. Box 77960
Washington, D.C. 20013

If you submit a request for review to the EEOC via commercial delivery or by a method requiring a signature, it must be addressed to:

Office of Federal Operations
Equal Employment Opportunity Commission
131 M Street, N.E.
Suite 5SW12G
Washington, D.C. 20507

**(3) Judicial review pursuant to the Whistleblower Protection Enhancement Act of 2012**. This option applies to you only if you have raised claims of reprisal for whistleblowing disclosures under 5 U.S.C. § 2302(b)(8) or other protected activities listed in 5 U.S.C. § 2302(b)(9)(A)(i), (B), (C), or (D). If so, and your judicial petition for review "raises no challenge to the Board's disposition of allegations of a prohibited personnel practice described in section 2302(b) other than practices described in section 2302(b)(8), or 2302(b)(9)(A)(i), (B), (C), or (D)," then you may file a petition for judicial review either with the U.S. Court of Appeals for the Federal Circuit or any court

of appeals of competent jurisdiction.[7]  The court of appeals must <u>receive</u> your petition for review within **60 days** of the <u>date of issuance</u> of this decision. 5 U.S.C. § 7703(b)(1)(B).

If you submit a petition for judicial review to the U.S. Court of Appeals for the Federal Circuit, you must submit your petition to the court at the following address:

> U.S. Court of Appeals
> for the Federal Circuit
> 717 Madison Place, N.W.
> Washington, D.C.  20439

Additional information about the U.S. Court of Appeals for the Federal Circuit is available at the court's website, www.cafc.uscourts.gov.  Of particular relevance is the court's "Guide for Pro Se Petitioners and Respondents," which is contained within the court's Rules of Practice, and Forms 5, 6, 10, and 11.

If you are interested in securing pro bono representation for an appeal to the U.S. Court of Appeals for the Federal Circuit, you may visit our website at http://www.mspb.gov/probono for information regarding pro bono representation for Merit Systems Protection Board respondents before the Federal Circuit.  The Board neither endorses the services provided by any attorney nor warrants that any attorney will accept representation in a given case.

---

[7] The original statutory provision that provided for judicial review of certain whistleblower claims by any court of appeals of competent jurisdiction expired on December 27, 2017.  The All Circuit Review Act, signed into law by the President on July 7, 2018, permanently allows respondents to file petitions for judicial review of MSPB decisions in certain whistleblower reprisal cases with the U.S. Court of Appeals for the Federal Circuit or any other circuit court of appeals of competent jurisdiction. The All Circuit Review Act is retroactive to November 26, 2017.  Pub. L. No. 115-195, 132 Stat. 1510.

Contact information for the courts of appeals can be found at their respective websites, which can be accessed through the link below:

http://www.uscourts.gov/Court_Locator/CourtWebsites.aspx.


FOR THE BOARD:                    _____
                                  Gina K. Grippando
                                  Clerk of the Board

Washington, D.C.